IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Dean Irvin, ) | Civil Action No.: 4:10-cv-02565-RBH |
|     Plaintiff, ) | |
| v. ) | **ORDER** |
| Rooms To Go, ) | |
|     Defendant. ) | |

Dean Irvin ("Plaintiff") filed his [Docket Entry 1-1] Complaint on August 31, 2010, alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"); and retaliation in violation of Title VII; against his former employer, RTG Furniture Corp. of Georgia (incorrectly identified in the Complaint as "Rooms to Go") ("Defendant").[1]

On July 15, 2011, Defendant filed its [Docket Entry 29] Motion for Summary Judgment, along with a memorandum in support, [Docket Entry 29-1]. After receiving two extensions of time in which to file, Plaintiff filed his [Docket Entry 38] Response in Opposition to the summary judgment motion on August 17, 2011. Defendant thereafter filed its [Docket Entry 39] Reply on August 22, 2011.

---

[1] The court notes that Plaintiff's Complaint also included claims of age discrimination in violation of the Age Discrimination in Employment Act, 26 U.S.C. § 621 et seq. ("ADEA"), and a hostile work environment in violation of the ADA. However, at the summary judgment hearing held before the Magistrate Judge, Plaintiff conceded that he had failed to exhaust his administrative remedies concerning the ADEA claim, and also that he could not establish the elements of his ADA hostile work environment claim. The Magistrate Judge noted the same in her Report and Recommendation, and concluded that summary judgment was appropriate on both of those claims. (R & R at 8.) Plaintiff does not object to summary judgment being granted as to either of these claims.

This matter is now before the court with the [Docket Entry 45] Report and Recommendation ("R & R") of United States Magistrate Judge Shiva V. Hodges[2] filed on October 7, 2011. In her R & R, the Magistrate Judge recommended that the court should grant Defendant's Motion for Summary Judgment. (*See* R & R at 17.) Plaintiff timely filed his [Docket Entry 46] Objections to the R & R on October 24, 2011, to which Defendant replied, [Docket Entry 47], on October 27, 2011.

The Magistrate Judge makes only a recommendation to the court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with the court. *Mathews v. Weber*, 423 U.S. 261, 270-71 (1976). The court is charged with making a *de novo* determination of those portions of the Report to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

The court is obligated to conduct a *de novo* review of every portion of the Magistrate Judge's report to which objections have been filed. *Id.* However, the court need not conduct a *de novo* review when a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). In the absence of a timely filed, specific objection, the Magistrate Judge's conclusions are reviewed only for clear error. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005).

---

[2] This matter was referred to Magistrate Judge Hodges pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 73.02(B)(2)(g), D.S.C.

**Facts**

Plaintiff is an African-American male who was 58 years old when he was terminated by Defendant in October of 2009. Robert "Bob" Beadling, the Rooms to Go ("Store") store manager, hired Plaintiff to work as a sales associate in May of 2007. Pam Deluca was the associate store manager and reported to Beadling. Beadling, in turn, reported to the regional vice president, Gary Hand, who reported to Elliot Kalick, vice president of sales.

Upon being hired, Plaintiff received the Store's associate handbook and traveled to Atlanta, Georgia, for orientation and training for his role as a sales associate responsible for selling furniture to customers entering the Store. (Plf Dep. [Docket Entry 29-2] at 14, 16.) Plaintiff signed an acknowledgment indicating that he had received and read the associate handbook, and understood the same. (Plf Dep. Ex. [Docket Entry 29-3] at 79.)

The Store's sales associates operated on an "Up" system, under which each sales associate would log in to the computer system upon arriving at work and be assigned an order in which they were to greet customers. (Plf Dep. [Docket Entry 29-2] at 17-20; Hand Dep. [Docket Entry 4] at 7-8.) Exceptions to the "Up" system existed. For example, the "be back" exception honored a customer's request to work with a specific sales associate that had helped them in the past. (Plf Dep. [Docket Entry 29-2] at 21-22.) Similarly, a customer can also request help from a sales associate different from the associate that initially greeted him or her; this usually occurs when the sales associate that greeted that customer becomes busy with other customers. (Hand Aff. [Docket Entry 29-7] ¶ 4.)

While employed by Defendant, Plaintiff "was one of the top sales associates in the store [in] terms of sales volume." (Beadling Aff. [Docket Entry 29-6] ¶ 3.) However, Plaintiff also had a documented history of conflicts with other sales associates regarding customers. (*Id.*) During 2008,

Beadling and Deluca had several meetings with Plaintiff regarding "his problems interacting with his co-workers." (*Id.*) During this same time period, Plaintiff wrote several letters to Human Resources ("HR") complaining about the way management had been treating him. (*See generally* Plf Dep. Ex. [Docket Entry 29-3] at 80-91.) For example, on October 30, 2008, Plaintiff sent a letter to HR complaining that Store management had been portraying him in a negative manner by accusing him of having an anger issue. (*Id.* at 83.) Similarly, on November 12, 2008, Plaintiff sent another letter to HR complaining that he had been harassed by Beadling. (*Id.* at 84-86.) That letter also documented several disputes that had occurred between Plaintiff and his co-workers, and he complained that he was being treated differently than his co-workers. (*Id.*)

On December 16, 2008, Plaintiff received his first of three Final Warnings regarding his behavior. Hand issued the first Final Warning to Plaintiff, which stated the following:

> Based on the pattern of behavior this past year this is to serve as final notice.
>
> I have reviewed all of the given information from my previous visit(s) and have determined that [Plaintiff] needs to control his emotions and his overall behavior. There are to be no more disruptions while in the showroom and all conflicts with sales/office associates and customers need to be directed to and discussed with the Store Management (Bob and Pam) only when available. Any aggressive behavior or issues that are not handled through the Store Management will not be acceptable. Failure to comply will lead to suspension and up to termination[.]

(*Id.* at 92.) Hand further suggested to Plaintiff that he "may want to take advantage of the company's Employee Assistance Program to help deal with his anger problems." (Hand Aff. [Docket Entry 29-7] ¶ 8.) After meeting with Beadling and Hand regarding the Final Warning, Plaintiff sent a letter to HR to "put on [the] record" that he "did not agree with [the write-up]." (Plf Dep. [Docket Entry 29-3] at 93.) Nonetheless, Plaintiff signed and dated the Final Warning, and he acknowledges that he knew Defendant expected him to take any future conflicts with other employees to Store

management. (*Id.* at 92; Plf Dep. [Docket Entry 29-2] at 114-17.) In addition, Plaintiff understood that any future policy violations could lead to his termination. (Plf Dep. [Docket Entry 29-2] at 117.)

Plaintiff received his second Final Warning on January 25, 2009, for a violation of the "Up" system. (Plf Dep. [Docket Entry 29-3] at 95.) The Final Warning accuses Plaintiff of engaging another sales associate's customer on the floor that did not ask for him. (*Id.*) Plaintiff contends that this customer was joining his sister, whom Plaintiff was already servicing and who had requested that Plaintiff help her brother as well. (*Id.* at 5-9.) The Final Warning indicates that Plaintiff refused to sign the disciplinary form. (*Id.* at 95.) Also, the Final Warning again advised that "any violation of any company policy [in the future] w[ould] result in termination." (*Id.*)

Plaintiff received his third Final Warning on March 12, 2009, for another violation of the "Up" system and was suspended for three (3) days as a result. (*Id.* at 96.) This third Final Warning indicated that Plaintiff "took over" a customer that had been greeted by another sales associate, claiming that the customer was a "be back." (*Id.*) Further, the Final Warning accused Plaintiff of failing to get management involved to settle the dispute between himself and the other sales associate. (*Id.*) This Final Warning again advised Plaintiff that his "next violation of Store, company floor rules may result in termination." (*Id.*)

Following his three (3) day suspension, Kalick and Hand held a conference call with Plaintiff to discuss his performance problems. (*Id.* at 22-23.) Plaintiff denied doing anything inappropriate, and told Kalick and Hand that he was being falsely accused by management. (*Id.* at 24.) Plaintiff, however, did not indicate to Kalick and Hand that he believed his race, age, or disability were the reasons for his suspension. (*Id.*)

A series of incidents involving Plaintiff on September 28, 2009, led to his ultimate

5

termination. On that date, Plaintiff was scheduled to work the evening shift, with Deluca and Luann Duncan, another sales associate. (Deluca Aff. [Docket Entry 29-5] ¶ 5 & p. 8-9.) The Store was short-staffed because two employees were out sick, including an office employee, so Deluca was covering both the office and sales floor. (*Id.*) At approximately 6:45 p.m., Plaintiff asked Deluca if he could take his lunch break in order to meet his family at a nearby restaurant. (*Id.*) Deluca told Plaintiff that, because the day-shift associates had already left and because the Store was short-staffed, he could eat in the break room when he was not with customers, but could not leave the Store to eat. (*Id.*; Duncan Aff. [Docket Entry 29-15] ¶ 3 & p. 4-5.) Deluca avers that "[e]vening shift employees are aware that they should take their breaks prior to day shift employees leaving." (Deluca Aff. [Docket Entry 29-5] ¶ 5.) Plaintiff cannot recall any occasion when the Store was left manned by only two employees. (Plf Dep. [Docket Entry 29-3] at 52.)

According to Defendant, Plaintiff became irate, yelled and pointed his finger in Deluca's face, and told Deluca that he was going to take his break anyway and that she should could not stop him. (Deluca Aff. [Docket Entry 29-5] ¶ 5 & p. 8-9; Duncan Aff. [Docket Entry 29-15] at 4.) Plaintiff also told Deluca that she had no authority over him. (Deluva Aff. [Docket Entry 29-5] ¶ 5 & p. 8-9.) Deluca avers that she was "physically intimidated" by Plaintiff's actions, and she informed him that if he left the Store, he should not return until management determined the appropriate action. (*Id.*) After the incident, Deluca attempted to contact both Hand and Kalick for assistance. (*Id.*)

Later that evening, according to Defendant, Plaintiff was servicing several customers, and one of the customers approached Duncan for assistance. (Duncan Aff. [Docket Entry 29-15] ¶ 3 & p. 5.) Duncan avers that Plaintiff then confronted the customer about asking Duncan for help, at

which time, Duncan walked away and turned the customer over to Plaintiff to avoid embarrassing the customer. (*Id.*)

According to Defendant, shortly thereafter, another customer that Plaintiff had been servicing asked Duncan if she could ring up her purchase, as she had to get to the airport and could not wait any longer for Plaintiff's assistance. (*Id.*) After Duncan rang up that customer, Plaintiff demanded that Deluca credit the sale to him. (Deluca Aff. [Docket Entry 29-5] ¶ 5 & p. 9.) Deluca told Plaintiff that, pursuant to company policy, Duncan should get the credit for the sale because the customer had asker her to ring up the purchase. (*Id.*) Plaintiff started to argue with Deluca, and Deluca walked away. (*Id.*) A few minutes later, Plaintiff again approached Deluca and demanded that she credit him for the sale; Deluca informed Plaintiff that Duncan had not "taken" his customer, but that the customer had approached Duncan for assistance. (*Id.*) At this point, according to Defendant, Plaintiff called Deluca a "liar," and told her that he "will get her." (*Id.*) Duncan states that Deluca was "visibly shaken and trembling" after this incident. (Duncan Aff. [Docket Entry 29-15] ¶ 3.)

Deluca reported these incidents to both Hand and Kalick. (Deluca Aff. [Docket Entry 29-5] ¶ 5.) Hand arrived at the Store a few days later to conduct an investigation. (Hand Aff. [Docket Entry 29-7] ¶ 12.) Hand met with both Deluca and Duncan, and took statements from them documenting what they witnessed. (*Id.* ¶ 5 & p. 18-19.) Duncan specifically requested that she not be scheduled to work the closing shift with Plaintiff again. (Duncan Aff. [Docket Entry 29-15] ¶ 3.) Hand also met with Plaintiff, who denied behaving as described by Deluca and Duncan. (Hand Aff. [Docket Entry 29-7] ¶ 12 & p. 21.) Plaintiff told Hand that Duncan had attempted to steal his customers and, that when he approached Deluca about it, Deluca called him a liar. (*Id.*) Plaintiff

7

specifically denied,[3] to Hand, yelling at Deluca or pointing his finger in her face. (*Id.*) Hand also questioned Plaintiff about the fact that another sales associate, Duncan, had witnessed the events and corroborated Deluca's statement about the same; Plaintiff told Hand that Duncan was a liar. (*Id.*)

After Hand completed his investigation, Hand, Kalick, and HR made the decision that Plaintiff should be terminated for his actions on September 28, 2009. (Kalick Dep. [Docket Entry 29-8] at 6-8; Hand Dep. [Docket Entry 29-4] at 18-19.) In making their decision, Hand, Kalick, and HR reviewed the circumstances surrounding the events on September 28, 2009, along with Plaintiff's past performance history. (Kalick Dep. [Docket Entry 29-8] at 6-7; Hand Dep. [Docket Entry 29-4] at 18-19.) Hand advised Plaintiff of his termination on October 8, 2009. (Hand Aff. [Docket Entry 29-7] ¶ 13.)

After the September 28, 2009 incidents, but before his ultimate termination, Plaintiff sent letters to HR outlining his version of the events on September 28, complaining about how Deluca treated him that night, and setting forth examples of management's "insubordination" towards him. (Plf Dep. [Docket Entry 29-3] at 101-06.) Plaintiff did admit in the letters that he called Deluca a "liar" on September 28, 2009. (*Id.* at 103.)

## Discussion

I.  ADEA Claim and ADA Hostile Work Environment

As discussed above,[4] Plaintiff's Complaint asserted an ADEA claim and an ADA hostile work environment claim. In her R & R, the Magistrate Judge recommended that summary judgment

---

[3] Likewise, in his deposition, Plaintiff specifically denied yelling at Deluca, getting in her face, or pointing his finger at her. (Plf Dep. [Docket Entry 29-3] at 59-60.)

[4] *See supra* footnote 1.

should be granted as to each of these claims. (R & R at 8.) Specifically, the Magistrate Judge found that Plaintiff, at the summary judgment hearing, "conceded that he failed to exhaust his administrative remedies concerning his ADEA claim," and further "conceded at the hearing that he c[ould not] establish the elements of his ADA hostile work environment claim." (*Id.*) Plaintiff did not object to the Magistrate Judge's recommendation regarding either of these claims. Accordingly, the undersigned shall grant summary judgment for Defendant on both the ADEA claim and the ADA hostile work environment claim.

II.     Title VII Race Discrimination

In his Objections, Plaintiff first contends that the Magistrate Judge erred in finding that Defendant is entitled to summary judgment on his Title VII claim for race discrimination. The court disagrees and overrules this objection.

Because Plaintiff has not presented any direct evidence of race discrimination, he proceeds under the indirect evidence burden-shifting method of proof established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that burden-shifting scheme, Plaintiff has the initial burden to establish a prima facie case of race discrimination, by showing that "(1) []he is a member of a protected class; (2) []he suffered adverse employment action; (3) []he was performing h[is] job duties at a level that met h[is] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004). If Plaintiff succeeds in establishing his prima facie case, the burden then shifts to Defendant to produce "a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* Assuming Defendant meets its burden of production, "the burden shifts

back to [] [P]laintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

As an initial matter, the undersigned agrees with the Magistrate Judge that Plaintiff has failed to establish his prima facie case of discrimination. Plaintiff has not shown that he was meeting Defendant's "legitimate expectations" at the time of his adverse employment action. Plaintiff appears to rely on the fact that he was a top sales associate at the time of his firing, which is uncontested by Defendant. However, while this evidence tends to show that Plaintiff was "qualified" for his sales associate position, circuit precedent requires that Plaintiff also show that he was "meeting his employer's legitimate job expectations." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 514 (4th Cir. 2006). Factors that employers may focus on in determining whether expectations are being met include an employee's "poor job performance or infractions of company rules." *Id.* Here, Defendant has submitted evidence that shows Plaintiff had a documented work history replete with conflicts between himself and other associates regarding customers and credit for sales. *See id.* at 515-16 (noting that "because a plaintiff must show by a preponderance of the evidence that he met the employer's legitimate job expectations to prove his prima facie case, the employer may counter with . . . evidence that the employee was not meeting those expectations"). As a matter of fact, Defendant ultimately cited Plaintiff's past work history as a factor in his termination. (*See* Hand Dep. [Docket Entry 29-4] at 18-19.) In addition, Defendant has also submitted evidence to show that Plaintiff, on at least one occasion, argued with another sales associate regarding a customer without getting management involved to settle the dispute, which was a known violation of Store policy. (*See* Plf Dep. [Docket Entry 29-2] at 114-17; Plf Dep. [Docket Entry 29-3] at 95-96.) Thus, even taking

the evidence in a light most favorable to Plaintiff, the court concludes that no reasonable jury would find that Plaintiff was meeting Defendant's legitimate job expectations. Similarly, Plaintiff has also failed to establish the fourth element of his prima facie case, as Defendant has submitted evidence, uncontested by Plaintiff, that the "next sales associate hired after [Plaintiff's] discharge was [also] black." (Beadling Aff. [Docket Entry 29-6] ¶ 12.)

Moreover, even if the court were to assume that Plaintiff could establish his prima facie case, Plaintiff has not submitted evidence of pretext sufficient to rebut Defendant's articulated, nondiscriminatory reason for terminating his employment. Defendant has offered a legitimate reason for terminating Plaintiff–to wit, his history of past conflicts with other sales associates and management, and his insubordinate conduct towards Deluca on September 28, 2009–and Plaintiff has failed to show that this proffered reason was not Defendant's true reason for terminating him. While Plaintiff alleges that management treated him unfairly and differently from other employees,[5] and also falsely accused him of things, Plaintiff appears to rely only on his own suspicion and beliefs that this treatment was because he was black. (*See* Plf Dep. [Docket Entry 29-2] at 70-71; Plf Dep. [Docket Entry 29-3] at 3-4.) This unsubstantiated and speculative evidence is insufficient to create a genuine issue of material fact. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) ("Evans unsubstantiated allegations and bald assertions . . . fail to disprove TAS's explanation or show discrimination."); *Goldberg v. B. Green and Co.*, 836 F.2d 845, 848 (4th Cir. 1988) ("Goldberg's own naked opinion, without more, is not enough to establish a prima facie case of [] discrimination.").

---

[5] The court notes that Defendant has presented evidence of disciplinary actions being taken against multiple white employees of the Store for conduct similar to that of Plaintiff. (*See* Beadling Aff. [Docket Entry 29-6] ¶ 11.)

Similarly, although Plaintiff also claims that he verbally complained to management about race discrimination on multiple occasions, Beadling, Hand, and Kalick all dispute that Plaintiff complained about any kind of discrimination during his employment. (*See* Beadling Dep. [Docket Entry 29-9] at 7; Hand Aff. [Docket Entry 29-7] ¶ 14; Kalick Dep. [Docket Entry 29-8] at 5, 7.) Further, in Plaintiff's numerous letters he sent to HR regarding management's treatment of him, Plaintiff never once stated that he was being treated differently because of his race. As a matter of fact, Plaintiff admitted in his deposition that these letters made no mention of "race" discrimination. (*See*, *e.g.*, Plf Dep. [Docket Entry 29-2] at 67, 77.)

Finally, and most importantly, the court agrees with the Magistrate Judge that "Plaintiff has presented no evidence that Defendant's decision to terminate him was other than because it believed the complaints of his coworkers and Deluca." (R & R at 13.) The Fourth Circuit has cautioned that the district court is not to "weigh[] the prudence of employment decisions made by firms charged with employment discrimination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (internal quotations and citation omitted). Rather, the court's "sole concern" is to determine

> whether the reason for which the defendant discharged the plaintiff was discriminatory. Thus, when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.

*Id.*; *see also Malghan v. Evans*, 118 F. App'x 731, 733 (4th Cir. 2004) ("The law does not require an employer to make . . . employment choices that are wise, rational, or even well-considered, as long as they are nondiscriminatory."). Here, it appears clear that the complaints about Plaintiff had been believed in the past, as evidenced by the three Final Notices that Hand issued to Plaintiff regarding his conduct. (*See* Plf Dep. [Docket Entry 29-3] at 92, 95-96.) Hand even recommended

to Plaintiff that he "may want to take advantage of the company's Employee Assistance Program to help deal with his anger problems." (Hand Aff. [Docket Entry 29-7] ¶ 8.) As to the incidents on September 28, 2009 that led to Plaintiff's termination, Defendant has presented evidence that both Deluca and Duncan witnessed Plaintiff's hostility and anger. As a matter of fact, Duncan has specifically stated that "Deluca appeared to be visibly shaken and trembling" after the incidents on that date. (Duncan Aff. [Docket Entry 29-15] ¶ 3.) Duncan immediately alerted upper-management about the incidents on September 28, 2009, and Hand thereafter conducted an investigation that included interviewing Deluca, Duncan, and Plaintiff about the events in question. After conducting that investigation, Defendant's decisionmakers–Hand, Kalick, and HR–determined that Plaintiff should be terminated due to his insubordinate conduct on September 28. While Plaintiff contends that he did not act as Defendant alleges, he has failed to present any evidence that Defendant's decisionmakers did not honestly believe that Plaintiff had been insubordinate and should be terminated for the same; "[i]t is the perception of the decision[]maker which is relevant." *Evans*, 80 F.3d at 961 (internal quotations and citation omitted).

In sum, Plaintiff has failed to establish his Title VII race discrimination claim. Not only did Plaintiff fail to meet his burden in establishing a prima facie case of discrimination, but Plaintiff has not submitted any evidence that rebuts Defendant's articulated, nondiscriminatory reason for his termination. There is no evidence from which a reasonable jury could conclude that Defendant's articulated, nondiscriminatory reason for terminating Plaintiff was not its true and legitimate reason for doing so. Accordingly, Defendant is entitled to summary judgment on Plaintiff's Title VII race discrimination claim.

III.   ADA Failure to Accommodate

Plaintiff also contends that the Magistrate Judge erred in finding that Defendant had not violated the ADA by failing to provide Plaintiff with a reasonable accommodation for his disability. The court disagrees.

"In a failure to accommodate case, the plaintiff must show '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations.'" *Schneider v. Giant of Md., LLC*, 389 F. App'x 263, 267 (4th Cir. 2010) (quoting *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (citation and internal quotations omitted)). "[A]n employer must make 'reasonable accommodations' for a disabled employee, unless the company can demonstrate that the accommodation 'would impose an undue hardship on the operation of the business.'" *Id.* at 271 (quoting 42 U.S.C. § 12112(b)(5)(A)).

In reviewing Plaintiff's claim under the ADA, the Magistrate Judge began by noting that Plaintiff, at the summary judgment hearing, "rested his ADA failure to accommodate claim on the single episode of September 28, 2009, when Deluca denied his request to leave the Store for his lunch break." (R & R at 15.) Plaintiff did not dispute this limitation in his Objections, so the undersigned will likewise limit the court's analysis to this single incident. In addition, the court notes that Defendant does not dispute, for purposes of its summary judgment motion, that Plaintiff's diabetes constitutes a "disability" under the ADA.

Turning now to the incident that occurred on September 28, 2009, Deluca, on that date, denied Plaintiff's request to leave the Store in order to eat with his family at a nearby restaurant.

Plaintiff alleges this denial as the basis for his failure to accommodate claim. However, as the Magistrate Judge accurately concluded, Plaintiff has not set forth any evidence to show that he requested to leave the Store to eat *because of* his diabetes–i.e., that he requested a "reasonable accommodation" for his "disability." Rather, to the contrary, the evidence in the record simply reflects that Plaintiff requested to leave the Store to meet his family for dinner, and that Deluca denied his request because the Store that evening was short-staffed.[6] There is no evidence that Deluca denied Plaintiff the opportunity to take his lunch break at the Store. Even taking this evidence in the light most favorable to Plaintiff, the court concludes that Plaintiff has failed to show that Defendant's refusal to allow him to leave the Store on a short-staffed shift to have dinner with his family constituted a failure to provide him a reasonable accommodation for his disability, especially when Plaintiff did not indicate to management that the request was being made on account of his diabetes. *See Schneider*, 389 F. App'x at 269 ("Schneider's claim for failure to accommodate his loss of driving privileges . . . fail[s] because he . . . did not inform his employer that the reason he needed an accommodation in August 2005 was because of his diabetes.").

Accordingly, the court overrules Plaintiff's objection and concludes, as did the Magistrate Judge, that summary judgment should be granted as to Plaintiff's ADA failure to accommodate claim.

IV.     Title VII Retaliation on the Basis of Race

Lastly, Plaintiff argues in his Objections that the Magistrate Judge erred in finding that he failed to establish a cause of action for retaliation under Title VII. The court again disagrees and

---

[6] The court notes that Plaintiff admitted in his deposition that he cannot recall any other occasion when the Store was left manned by only two employees, (Plf Dep. [Docket Entry 29-3] at 52), which would have been the case if Deluca had permitted Plaintiff to leave the Store to go eat with his family.

overrules this objection.

Title VII's retaliation provision provides the following: "It shall be unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation, Plaintiff must prove that "(1) [he] engaged in protected activity . . . ; (2) the employer took adverse employment action against [him]; and (3) a causal connection existed between the protected activity and the adverse action." *Carter v. Bell*, 33 F.3d 450, 460 (4th Cir. 1994) (citing *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)). As with Plaintiff's Title VII race discrimination claim, the *McDonnell-Douglas* burden-shifting scheme is utilized. If a prima facie case is made, the burden of production shifts to Defendant to articulate a legitimate, non-retaliatory reason for the challenged action. *Carter*, 33 F.3d at 460. Once Defendant produces its "non-retaliatory" reasons for acting, "[t]he burden then shifts back to [P]laintiff to prove the pretextual nature of those reasons." *Id.*

In her R & R, the Magistrate Judge concluded that, although Plaintiff clearly suffered an adverse employment action through his termination, he could not establish the first and third elements of his prima facie retaliation claim. (R & R at 16.) In his Objections, however, Plaintiff appears to only object to the Magistrate Judge's conclusion regarding the first element, and he failed to set forth any facts or arguments in his Objections to show the third element–the existence of a "causal connection." Therefore, even if the court were to assume, *arguendo*, that Plaintiff engaged

in a "protected activity,"[7] he has failed to show a "casual connection" between that activity and his ultimate discharge. Defendant has set forth substantial evidence that it terminated Plaintiff due to his insubordinate conduct on September 28, 2009. To the contrary, the only evidence that Plaintiff's termination was "causally connected" to his alleged verbal complaints to management regarding discrimination is the opinion of Plaintiff himself. "A plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a prima facie case of discrimination." *Mackey v. Shalala*, 360 F.3d 463, 469-70 (4th Cir. 2004) (italics removed). Accordingly, the court concludes that Plaintiff has failed to establish his prima facie claim of retaliation under Title VII.[8]

Moreover, even if Plaintiff could establish a prima facie claim of retaliation, the court

---

[7] This assumption notwithstanding, the court agrees with the Magistrate Judge that Plaintiff has also failed to show that he engaged in a "protected activity." To prove that he engaged in a "protected activity," Plaintiff need only show that "he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." *Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003) (internal citations and quotations omitted). Plaintiff contends, in his Objections, that he made several verbal complaints to management about alleged racial discrimination and that these complaints constituted a "protected activity." However, as the Magistrate Judge correctly concluded, the evidence simply does not support such a finding. Plaintiff wrote numerous letters to HR regarding his treatment by management, and in none of these letters did Plaintiff ever mention that he felt race played a role in his alleged harassment. (*See* Plf Dep. [Docket Entry 29-3] at 80-91.) As a matter of fact, Plaintiff admitted in his deposition that these letters made no mention of "race" discrimination. (*See*, *e.g.*, Plf Dep. [Docket Entry 29-2] at 67, 77.) The only evidence that Plaintiff ever complained about race discrimination to management is his own, unsubstantiated testimony regarding his verbal complaints, which is insufficient to create a genuine dispute of material fact. *See Evans*, 80 F.3d at 960.

[8] The court also notes, as did the Magistrate Judge, that the lapse of time between when Defendant first became aware of Plaintiff's alleged complaints regarding race discrimination and his ultimate termination negates any inference that a causal connection existed between the two. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exist[ed] between the two."); *see also Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) ("Thirteen months passed between [plaintiff's] initial charge and termination. A thirteen month interval between the charge and termination is too long to establish causation absent other evidence of retaliation."). Here, at least one year passed between Plaintiff first complaining to management and HR regarding his alleged complaint of discrimination and his ultimate termination. Plaintiff appears to allege that he first verbally complained about possible race discrimination in early to mid 2008, (Plf Dep. [Docket Entry 29-2] at 39-42), and his termination did not occur until September 28, 2009. Even Plaintiff's letters to HR, which again did not mention race, were sent almost one year prior to his termination.

concludes that Plaintiff is unable to show that Defendant's proffered reasons for his termination were pretextual. Again, Defendant has submitted substantial evidence to show that it terminated Plaintiff due to his several instances of insubordinate conduct on September 28, 2009, and Plaintiff has not set forth evidence sufficient to show that this rationale was pretextual. Therefore, the court agrees with the Magistrate Judge that summary judgment should be granted as to Plaintiff's retaliation claim.

### Conclusion

The court has thoroughly reviewed the entire record, including the R & R and Plaintiff's Objections thereto, and the applicable law. For the reasons stated above and by the Magistrate Judge, the court hereby overrules all of Plaintiff's Objections and adopts and incorporates by reference the Magistrate Judge's R & R. Accordingly, it is therefore **ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

      s/R. Bryan Harwell
      R. Bryan Harwell
      United States District Judge

Florence, South Carolina
February 14, 2012